UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO: 2:23-cv-14287



RYAN HOLMES

Plaintiff,

v.

INDIAN RIVER COUNTY SHERIFF OFFICE,

[Deryl Loar, in his official and individual capacity

as Sheriff of Indian River County, Florida],

Deputy Sheriff CHRISTIAN MATHISEN,

in his individual capacity,

Deputy Sheriff BRANDON MCKAY,

in his individual capacity,

Deputy Sheriff RICARDO FERRE,

in his individual capacity,

Deputy Sheriff DYLAN FARINACCI,

in his individual capacity,

Deputy Sheriff PATRICK WHITE,

in his individual capacity,

Defendants

_____/

### FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND

Plaintiff, RYAN HOLMES, in propria persona, sues Defendants to allege and verify the

following Complaint:

### INTRODUCTION

1.  This is an action involving the violation of Plaintiffs federal civil rights, by Defendants acting

under color of state law, and contains state causes of action pursuant to this Court's concurrent

and pendant jurisdiction. The aggregate amount of damages claimed by the Plaintiff against all

Defendants is in excess of $75,000.00.

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 (a)(3) in that this action seeks to redress the deprivation, under color of law, of rights secured to Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

3.    Plaintiff's claims for relief are predicated on 42 U.S.C § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiff by the Constitution and laws of the United States.

4.    Venue is appropriate in this Court as the illegal acts alleged to have been committed by Defendants against Plaintiff occurred wholly within Indian River County, Florida.

5.    A written notice of Plaintiff's claims asserted was submitted to County Attorney for Indian River County, Florida, and to the Florida Department of Financial Service on or about March 12, 2023, a copy of which is attached hereto as Exhibit A. No response was received by the Plaintiff, therefore the allegations contained therein are deemed denied by operation of law.

6.    All conditions to bringing this action under state and federal law has occurred or have been satisfied.

## PARTIES

7.    Plaintiff, RYAN HOLMES (herein after "HOLMES"), is a citizen of the State of Florida residing in Indian River County and is otherwise *sui juris*.

8.    Defendant, DEPUTY SHERIFF RICARDO FERRE, (herein after "FERRE"), at all times material to this action, was employed by the IRCSO as a deputy sheriff. He is sued in his individual capacity.

9.    Defendant, DEPUTY SHERIFF CHRISTIAN MATHINSEN, (herein after "MATHINSEN"), at all times material to this action, was employed by the IRCSO as a deputy sheriff. He is sued in his individual capacity.

10.  Defendant, DEPUTY SHERIFF DYLAN FARINACCI, (herein after "FARINACCI"), at all times material to this action, was employed by the IRCSO as a deputy sheriff. He is sued in his individual capacity.

11.  Defendant, DEPUTY SHERIFF BRANDO MCKAY, (herein after "MCKAY"), at all times material to this action, was employed by IRCSO as a deputy sheriff. He is sued in his individual capacity.

12.  Defendant, INDIAN RIVER COUNTY SHERIFF OFFICE (herein after "IRCSO") [Deryl Loar, in his capacity as Sheriff of Indian River County, Florida] is an entity, corporate and political, duly organized under the laws of the State of Florida. IRCSO is the governmental entity responsible, as a matter of law, for the actions of its officials, agents, and employees, and was responsible for their training, supervision, and conduct. IRCSO is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.

### UNDERLYING FACTS

13.  On or about early January 2018, RYAN HOLMES (hereinafter "HOLMES") became separated from his girlfriend of 12 years, mother of his son and stepson, and was going through a bitter custody battle. At the time HOLMES worked as a repair specialist with Vero Beach Roofing, repairing high end homes in Johns Island and the surrounding area.

14.  The separation was precipitated, in large part, by an affair that the mother (Andrea Schulze) of his child was having with a neighbor. Although HOLMES had never been violent or he had ever threatened violence in their 12-year relationship, the mother was still able to secure a frivolous temporary protection order.

15.  In the evening of September 11, 2019, deputies with the Indian River Sheriff Office came to the house where HOLMES lived to serve him with the temporary protection order signed by Judge Cynthia Cox, however they were unable to do so.

16. Deputies came to HOLMES' house several more times but again, they were unable to serve HOLMES.

17. Around 1pm on September 13, 2019, HOLMES received a phone call from his ex-girlfriend, Andrea Schulze.

18. Given the ongoing contentious nature of the separation and custody proceedings, and concern over potential false accusations that could and had previously come from the mother of his child, HOLMES recorded every phone conversation he had with her. Schulze had made numerous false accusations against HOLMES in the past which led him to being arrested.

19. HOLMES occupied the back portion of the home he owns located at 1050 10th Pl. in Vero Beach, FL. and the front portion was rented to a tenant. Both HOLMES and the tenet were home when he received the phone call from Ms. Schulze.

20. When HOLMES answered his phone, he immediately could tell Ms. Schulze was in distress. She franticly and repeatedly told HOLMES his life was in immediate danger and that if he didn't flee his home immediately, he would be seriously injured or killed. When HOLMES asked who was coming to his home Ms. Schulze replied, "the cops Ryan".

21. The phone conversation was short, lasting under two minutes. HOLMES did not believe Ms. Schulze even after she began sobbing and begging him to leave his residence. The conversation ended with HOLMES telling Ms. Schulze to leave him alone and then he hung up.

22. HOLMES walked into the front part of his house and was having a conversation with his tenet, when approximately 5 minutes after ending the phone conversation with Ms. Schulze he heard a loud "BOOM" echo throughout the house. The noise repeated as HOLMES ran back to his portion of the home and immediately realized someone was trying to force entry into his home through the side door.

23. A few months prior, on March 13, 2019, Ms. Schulze had falsely accused HOLMES of breaking into the home that they use to share. As a result, a warrant was issued, and HOLMES was arrested. During the arrest HOLMES was tasered by Deputy Chief Campbell while he stood

peacefully with his hands on his head and then HOLMES was severely beaten while handcuffed which caused him serious injuries.

24. The conversation HOLMES had had with Ms. Schulze only minutes prior in combination with past violent encounters with the IRCSO that had violated his civil rights and left him seriously injured and the fact that his door was currently being kicked down by unknown assailants, HOLMES believed his life was in immediate danger and he chose to flee instead of fight.

25. Without a warrant, probable cause or exigent circumstances, deputies with the IRCSO forced entry into HOLMES' home.

26. HOLMES fled for his life and ran into the safety of his attic to hide.

27. Curled up in the fetal position HOLMES laid perfectly still in his attic recounting the phone conversation he had just had with Ms. Schulze. Even though HOLMES knew he had broken no law, he now believed every word she had just said to him.

28. Due to the lack of transparency and accountability of the IRCSO it is unknown which deputy informed Ms. Schulze that a raid was about to take place at HOLMES' residence, but it is a undeniable fact that only a member of the IRCSO would possess such privileged information.

29. At 3:00pm on September 13th, 2019, the temperature in Vero Beach Florida was 89.1 degrees. Holmes was in his attic which likely had a temperature easily exceeding 100 degrees for about an hour when he saw several large holes open in the drywall ceiling.

30. At no time while HOLMES was in the attic, or any time before did anyone identify themselves as law enforcement or did he hear them give any verbal commands.

31. Over a two-hour period approximately 10 to 12 OC and tear gas cartridges were thrown and shot at HOLMES by Deputy MATHISEN and other members of the IRCSO.

32. Deputies went throughout the 2,000sq ft house owned by HOLMES smashing numerous holes in almost every room of the house. Electrical wiring was cut, HVAC duct work was smashed, furniture destroyed, insulation ripped down, and the entire attic was covered in chemicals.

33. HOLMES posed no danger or threat to law enforcement and deputies knew exactly where he was ever since locating him in the attic. Other than hiding, HOLMES offered no resistance. After almost three hours of being tortured in his own home, two large holes opened on either side of HOLMES and for the first time he could faintly hear deputies telling him to jump out of the attic.

34. The deputies were all wearing gas masks making it almost impossible for HOLMES to hear their voices and commands. HOLMES was extremely and dangerously dehydrated. The chemicals made it to where he could not talk, could not swallow, his ears were ringing, eyes burning out of his skull, and his lips were so dry they felt like rubber.

35. When HOLMES landed on the floor of his kitchen, he kept his head down bracing for another beating like one he had received from Deputy Chief Campbell four months prior.

36. About thirty seconds went by and HOLMES slowly lifted his head. He saw deputies circled all around him with their guns pointed in his direction. They were wearing gas masks. A voice that sounded like Darth Vader finally spoke, "this motherfucker isn't human", said a deputy.

37. HOLMES was close to death. Paramedics wheeled a stretcher into the living room. HOLMES was placed on a stretcher and handcuffed to it. A single deputy accompanied HOLMES while paramedics wheeled him out of his home. This deputy was later identified by videos taken by bystanders as FARINACCI.

38. When HOLMES was placed on the stretcher and being wheeled outside FARINACCI told him he was being arrested for trespassing and resisting arrest without violence. HOLMES who was extremely dehydrated and in intense pain tried to say "water" but a intense pain shot through his throat preventing him from speaking.

39. As HOLMES was being pushed down the sidewalk leading to the front of his home, he tried several times until finally he successfully communicated to FARINACCI that he desperately needed water. FARINACCI looked at HOLMES and shook his head no.

40. A minute later HOLMES and FARINACCI were in the back of an ambulance. Upon seeing a paramedic who was sitting next to him, HOLMES fought through extreme pain just to again

muster the word "water". The paramedic turned around as if he was reaching for a bottle of water, but FARINACCI stopped him. He told the paramedic, "No, he will get some at the hospital."

41. Approximately 20 minutes later they arrived at the hospital.

42. Upon seeing a nurse open the back door of the ambulance, HOLMES again fought through the pain and said the word "water". The nurse began to smile but again FARINACCI intervened and instructed her not to give HOLMES any water. The nurse's smile quickly faded and turned into a look of confusion.

43. HOLMES was wheeled into a hospital room and nurses began treating him for his injuries. The nurses complied with FARINACCI'S order not to give water to HOLMES. After what seemed like an eternity several detectives came into the hospital room to serve HOLMES with the protection order Judge Cox had signed and to ask him questions.

44. Immediately upon entering the room, one of the detectives handed HOLMES a cold bottle of water. Obviously, HOLMES would be unable to answer his questions if he couldn't talk. After receiving the water HOLMES was then served with the temporary protection order.

45. HOLMES still had no idea what was going on, why he had been arrested, or why deputies had just forced entry into his home or why deputies with the IRCSO had almost killed him. The detectives told him that he had been arrested for trespassing and resisting arrest without violence. HOLMES, who still believed his life was in danger, was very cooperative and answered all the questions which were mainly, almost entirely unrelated to the current incident.

46. At approximately 2:48am on September 14th, 2019, HOLMES was booked into the IRC jail.

47. Upon being booked into jail, HOLMES' charge was changed from trespassing to stalking. The resisting arrest without violence charge remained.

48. A few hours later, around 8am, HOLMES was taken to first appearance. Upon his case being called a deputy with the IRCSO stood up and asked to speak to the judge. The deputy spoke for close to five minutes and told the judge HOLMES was a violent and dangerous person and that he was confident if HOLMES were to be released that he would kill Ms. Schulze. The deputy asked

the judge to deny HOLMES bail. The judge informed the deputy that Mr. HOLMES had only been charged with two misdemeanor charges and by law the most he could set bail at was $5,000 per charge.

49. The judge set bail for $5,000 for each charge. HOLMES posted bail a few hours later and was released. Ms. Schulze was never killed or physically hurt in any way by HOLMES.

50. On September 8, 2019, Deputy FERRE was dispatched to Ms. Schulze's home in reference to a trespassing complaint. FERRE alleges in his probable cause affidavit that "RYAN HOLMES IS SEEN ON VIDEO SURVEILLANCE FOOTAGE WALKING UP TO HER HOUSE. HOLMES WALKS UP TO THE FRONT DOOR AND THEN WALKS AWAY. HOLMES IS THEN SEEN ON VIDEO AGAIN WALKING AROUND THE HOUSE TOWARDS THE SOUTH PART OF THE HOUSE."

51. FERRE never submitted this video as evidence because the video proves his sworn statement of fact and allegations are false.

52. FERRE continues making false accusations against HOLMES in his seven-page probable cause affidavit by alleging HOLMES had sent Ms. Schulze numerous "aggressive" text messages.

53. None of these alleged text messages were sent by a phone number registered to HOLMES. FERRE admitted he did not do a IP address search on any of the phone numbers the text messages were sent from. Even if HOLMES had sent the messages, which he did not, they do not contain any content that could be considered illegal.

54. As a result of the false arrest and frivolous charge, including but not limited to HOLMES almost being killed and the IRCSO did over $35,000 in damage to HOLMES'S house.

55. Further, as a result of HOLMES having his home raided and being arrested, Ms. Schulze proceeded to file a motion in family court challenging HOLMES' custodial right and furthermore attempting to limit visitation with their son.

56. Additionally, due to this incident HOLMES permanently lost the possibility of being re-hired by his previous employer and his ability to secure future employment in Vero Beach was almost eliminated. HOLMES remained unemployed for several years after this incident.

57. Ms. Schulze submitted the video of HOLMES allegedly ringing her doorbell at the protection order hearing two weeks later. Judge Cox ruled in Ms. Schulze favor granting her a lifetime protection order.

58. On November 27, 2019, HOLMES went to court to face the frivolous charges against him. HOLMES' lawyer, Candace Hawthorne, HOLMES' mother, Barbara Altman and a family friend were all present.

59. Ms. Hawthorne verbally demanded that the prosecutor, Gina Kondziola, produce the video in question. Ms. Kondziola complied with the request and came back a few minutes later with a laptop.

60. In the hallway of the Indian River County courthouse Ms. Kondziola repeatedly played the video for HOLMES, Ms. Hathorne and Ms. Altman.

61. The video showed a person who was completely unidentifiable due to it being dark and the person wearing a hoodie, walking up to Ms. Schulze's door, ringing the doorbell and then turning around and walking away.

62. This video was now evidence against FERRE proving that he had intentionally lied in his report and vindicating HOLMES of any wrongdoing. Even if that was HOLMES, which it was not, ringing a doorbell and walking away is not a crime.

63. The video would go missing for over three years. The state attorney's office denied in writing that they had ever possessed the video. The IRCSO also denied in writing that they had ever possessed the video and claimed that if they had then it had likely been destroyed.

64. Unknown to HOLMES that while he was being tortured in his own home, his lawyer Candance Hawthorne, had made several calls to deputies and supervisors trying to figure out why they had forced entry into her clients home and why they were trying to arrest him.

65. On September 13, 2019, Barbara Altman, HOLMES' MOTHER, was illegally detained by deputies after they had witnessed her using her cell phone to video record them. On a video recorded by Ms. Altman she is told by a deputy that she is not free to leave.

66. During the incident Ms. Hawthorne demanded that a warrant be produced but was told by deputies and members of the SWAT team that there was no warrant. They all told her that Judge Cynthia Cox had ordered them to force entry into HOLMES' house and to do whatever is necessary to get HOLMES out of the attic and were instructed to bring in a crane to remove the trusses from his house if they had to.

67. Also unknown to HOLMES during the incident, both his mother and family friend were on scene during the entire incident and had recorded numerous videos of them talking to deputies.

68. The video FERRE never submitted as evidence showed beyond a shadow of a doubt that the events described by FERRE in his probable cause affidavit were false and fabricated by FERRE.

69. On December 16th, 2019, the state attorney's office issued a, "no information" for both charges of stalking and resisting arrest without violence, making HOLMES the prevailing party in the criminal action.

70. In January of 2023 HOLMES filed a citizen's complaint in reference to this incident. Ultimately, the investigation concluded with all allegations being UNOUNDED. However, the IRCSO intentionally failed to properly investigate themselves and any of HOLMES' allegations. No deputies were interviewed, and no witnesses were interviewed.

71. As a result of the Defendants actions as described herein, HOLMES and HOLMES 'minor child, LH, suffered special damages. The IRSO refused to pay for the catastrophic damage they did to HOLMES' house. All the holes in the ceiling were covered up with plywood because HOLMES could not afford to pay the estimated $8,000 it would cost just to repair the drywall. The HVAC duct system was a total loss and has never been replaced. Numerous light fixtures and electrical outlets do not work and have never been repaired. Most of the insulation in the attic had to be removed because it was covered in OC and tear gas which caused both HOLMES and LH to

cough and sneeze for years. HOLMES and LH were forced to live in a house with no insulation, extension cords running all over the floors, and holes all throughout the ceilings of the house for almost four years because of the Defendants actions.

72. HOLMES suffers from PTSD and other mental disorders directly due to this incident. He has never felt safe for a single second in his own home since this incident happened. It is still unknown what physical medical conditions HOLMES may have due to the large amount of OC and tear gas that he was exposed to.

73. By far the worst consequence of the Defendants actions is what LH was forced to endure. LH's mother let two violent gang members (Anthony and Austin Purdenti) move into her home and nothing HOLMES could do or say could stop LH from repeatedly being victimized and traumatized by these two men and his mother. HOLMES spent over $30,000.00 in family lawyer fees trying to remove his son from his mother's violent and abusive home, but his reputation had been destroyed.

74. FERRE violated HOLMES'S civil rights, granted to HOLMES by the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, by: (a) knowingly writing a report he knew was false (b) charging HOLMES with a crime he knew HOLMES did not commit (c) intentionally withholding and failing to submit video evidence that proves HOLMES did not commit a crime (d) charging HOLMES with Trespassing and Loitering and Prowling and then changing the charges to stalking after HOLMES had already been arrested (e) largely basing his probable cause on charges HOLMES had been arrested for but not convicted of (f) failing to properly investigate by not running a IP search of text messages he alleges HOLMES had sent Ms. Schulze even though they did not come from his phone number.

75. MATHISEN violated HOLMES'S civil rights, granted to HOLMES by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution by: (a) entering onto HOLMES property an into HOLMES'S home without a warrant or probable cause; (b) used unnecessary, and excessive force on the person of HOLMES depriving him of life, liberty, and due process of

law; (c) failed to issue any verbal commands, failed to identify himself as law enforcement; (d) retaliated against HOLMES for past comments he had made; (e) used an excessive, dangerous and potential deadly amount of OC and tear gas to arrest HOLMES who was hiding in a attic which had no ventilation and which was very small in square footage; (f) needlessly caused approximately $30,000.00 to the home and property of HOLMES; (g) made false statements on his arrest affidavit; (h) intentionally inflicted emotional and physical distress.

76. FARINACCI violated HOLMES'S civil rights, granted to HOLMES by the Fourth, Eighth and Fourteenth Amendments of the United States Constitution by: (a) torturing HOLMES while he was in his custody; (b) refusing to provide proper medical treatment while HOLMES was in his custody; (c) refusing to allow paramedics and nurses at the hospital to provide proper medical care for HOLMES while he was in his custody.

77. WHITE violated HOLMES civil rights, granted to HOLMES by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, by: (a) providing false statements in his arrest report to attempt to justify the illegal actions of himself and other deputies; (b) allowing other deputies to use excessive force against HOLMES and failing to intervene; (c) illegally entering HOLMES' home; (d) intentionally inflicted emotional and physical distress.

78. MCKAY violated HOLMES civil rights, granted to HOLMES by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, by: (a) wrongfully arresting and charging HOLMES with resisting arrest without violence; (b) illegally entering HOLMES' home; (c) allowing other Deputies to use excessive force on HOLMES.

79. All the foregoing violations of HOLMES civil rights caused him injury and damages. These violations were of the type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, including, but not limited to, the case law of Federal Court of Appeals of the United States, 11th circuit, and the U.S. Supreme Court.

80. LOAR, as Sheriff of Indian River County at the time of this incident, was responsible for the proper and efficient training of deputy sheriffs, the investigation and admonishment of deputy sheriffs, in addition to the enforcement of the laws, regulations, policies, practices and procedures of IRSO, the laws, regulations and Constitution of the State of Florida, and the laws, regulations and Constitution of the United States.

81. LOAR, as Sheriff of Indian River County at the time of this incident, was responsible for the investigation of the improper acts of the officers and personnel of the IRSO for their violations of the law and the General Orders of the IRSO.

82. LOAR intentionally refused to allow body cameras to be worn by his deputies because he knew the cameras would provide evidence of wrongdoing and civil rights violations against his deputies. Despite overwhelming support and demands from the community and civil rights organizations that LOAR implement a policy forcing his deputies to wear body cameras, LOAR refused. Instead of body cameras LOAR used the money to hire more deputies.

83. LOAR used and allowed his internal affairs department to clear deputies of illegal acts and IRSO rule polices they had committed.

## COUNT 1: 42 U.S.C. § 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS
## AGAINST FERRE
### (SEARCH AND SEIZURE WITHOUT WARRANT OR PROBABLE CAUSE)

84. Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

85. The actions of FERRE occurred within his scope of employment with IRCSO, under color of law, having occurred within the authorized time and space limits of his duties and for a purpose to serve LOAR.

86. At all times material hereto, FERRE had a legal duty not to subject HOLMES to unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

87. On September 13, 2019, FERRE subjected HOLMES to unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

88. FERRE violated HOLMES rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and violated HOLMES civil right to be free from unreasonable searches and seizures, by entering onto HOLMES property and entering his home, without a search warrant, probable cause or exigent circumstances.

89. These violations were of a type or character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the U.S. Supreme Court.

90. The aforesaid acts of FERRE were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of punitive damages.

91. As a direct and proximate result of the unlawful conduct of FERRE, HOLMES was deprived of his civil rights and forced to suffer great aggravation, humiliation, embarrassment, mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing with LH, and pecuniary losses including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against FERRE for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

## COUNT II: 42 U.S.C. § 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS
## AGAINST MATHISEN
## (SEARCH AND SEIZURE WITHOUT WARRANT OR PROBABLE CAUSE)

92. Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

93. The actions of MATHISEN occurred within his scope of employment with IRCSO, under color of law, having occurred within the authorized time and space limits of his duties and for a purpose to serve LOAR.

94. At all times material hereto, MATHISEN had a legal duty not to subject HOLMES to unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

95. On September 13, 2019, MATHISEN subjected HOLMES to unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

96. MATHISEN violated HOLMES rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and violated HOLMES civil right to be free from unreasonable searches and seizures, by entering onto HOLMES property and entering his home, without a search warrant, probable cause or exigent circumstances.

97. These violations were of a type or character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the U.S. Supreme Court.

98. The aforesaid acts of MATHISEN were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of punitive damages.

99. As a direct and proximate result of the unlawful conduct of MATHISEN, HOLMES was deprived of his civil rights and forced to suffer great aggravation, humiliation, embarrassment, mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing with LH, and pecuniary losses including loss of income and loss of earning capacity.

     WHEREFORE, Plaintiff demands judgement against MATHISEN for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

**COUNT III: 42 U.S.C. § 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS**

**AGAINST WHITE**

**(SEARCH AND SEIZURE WITHOUT WARRANT OR PROBABLE CAUSE)**

100.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1
through 83.

101.     The actions of WHITE occurred within his scope of employment with IRCSO, under
color of law, having occurred within the authorized time and space limits of his duties and for a
purpose to serve LOAR.

102.     At all times material hereto, WHITE had a legal duty not to subject HOLMES to
unreasonable search and seizure, without probable cause, warrant or exigent circumstances.

103.     On September 13, 2019, WHITE subjected HOLMES to unreasonable search and seizure,
without probable cause, warrant or exigent circumstances.

104.     WHITE violated HOLMES rights under the Fourth and Fourteenth Amendments to the
Constitution of the United States and violated HOLMES civil right to be free from unreasonable
searches and seizures, by entering onto HOLMES property and entering his home, without a
search warrant, probable cause or exigent circumstances.

105.     These violations were of a type or character as to which any reasonable person would be
aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in
Florida, in federal case law, including that of Federal Court of Appeals of the United States, 11th
Circuit, and under the case law of the U.S. Supreme Court.

106.     The aforesaid acts of WHITE were performed knowingly, intentionally, and maliciously,
and/or were performed in a reckless manner with callous and deliberate indifference to the health,
safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of
punitive damages.

107.     As a direct and proximate result of the unlawful conduct of WHITE, HOLMES was
deprived of his civil rights and forced to suffer great aggravation, humiliation, embarrassment,
mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing
with LH, and pecuniary losses including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against WHITE for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

## COUNT IV: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS AGAINST MCKAY

### (FALSE ARREST AND IMPRISONMENT)

108.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

109.     MCKAY, without process or authority of law, wrongfully, unlawfully, against HOLMES' will, and without probable cause, forcibly arrested and restrained HOLMES.

110.     HOLMES, at the time he was arrested and imprisoned, was acting peacefully and in a lawful manner. No warrant for HOLMES' arrest and imprisonment was ever issued until September 14, 2019, after HOLMES had already been arrested.

111.     The arrest was not objectively reasonable under the totality of the circumstances.

112.     The arrest and detention were not objectively reasonable under the totality of the circumstances.

113.     The aforesaid acts of MCKAY were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of punitive damages.

114.     By reason of the above, HOLMES was deprived of his liberty and has been caused great physical and mental suffering, aggravation, humiliation, embarrassment, mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing with LH, and pecuniary losses including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against MCKAY for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

## COUNT V: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS

## (FERRE-DEFAMATION)

115.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1

through 83.

116.     The actions of FERRE occurred within his scope of employment with IRCSO, under

color of law, having occurred within the authorized time and space limits of his duties and for a

purpose to serve LOAR.

117.     At all times material hereto, FERRE had a legal duty not to subject HOLMES to false

statements of fact in relation to HOLMES having committed a crime.

118.     Sometime between September 8, 2019, through September 13, 2019, FERRE defamed

HOLMES by making false statements of fact as to HOLMES in a fabricated probable cause

affidavit, including accusing HOLMES of repeatedly coming to the home of Ms. Schulze and it

being video recorded and shown to him.

119.     FERRE never submitted the video into evidence in which he claims to have seen

HOLMES repeatedly come onto the property of Anderea Schulze. If he had submitted the video

as evidence, then he would have been caught red handed lying.

120.     FERRE also claims and accuses HOLMES of sending Ms. Schulze numerous text

messages that did not come from his phone number. FERRE did not do a IP search of any of the

numbers associated with the texts.

121.     The Plaintiff was able to obtain the video is question several years later from the IRC

courthouse. The video shows an unidentifiable person walking up to the door of Ms. Schulze's

home, ringing a doorbell and a few seconds later walking away. The video is a direct

contradiction to FERRE'S description of facts in his probable cause affidavit.

122.    FERRE knew the statements he made in his probable cause affidavit were false and

defamatory but did so with the intent to injure HOLMES in connection with his custody

proceedings and to harm HOLMES' reputation in the community and financial standing.

123.    FERRE claims to have been able to identify HOLMES as the person in Ms. Schulze's

video even though the person is unrecognizable in the video and even though FERRE had never

met HOLMES in person.

124.    Given the malicious intent and background surrounding FERRE'S actions, his false

statements of fact were not privileged.

125.    FERRE violated HOLMES'S rights under the Constitution of the United States and

violated HOLMES right to be free from false statements of fact by a sheriff deputy acting under

the color of law.

126.    FERRE knew or should have known and every reasonable deputy sheriff in his position

would have concluded that HOLMES has a constitutional right not to be defamed by a deputy

sheriff making false statements of fact, which the deputy sheriff knew were false and defamatory.

127.    These violations were of a type or character as to which any reasonable person would be

aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in

Florida, in federal case law, including that of Federal Court of Appeals of the United States, 11th

Circuit, and under the case law of the U.S. Supreme Court.

128.    The aforesaid acts of FERRE were performed knowingly, intentionally, and maliciously,

and/or were performed in a reckless manner with callous and deliberate indifference to the health,

safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of

punitive damages.

129.    As a direct and proximate result of the unlawful conduct of FERRE, HOLMES was

deprived of his civil rights and forced to suffer great aggravation, humiliation, embarrassment,

mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing

with LH, and pecuniary losses including loss of income and loss of earning capacity.

130.     As a direct result and proximate result of FERRE'S civil rights violations, HOLMES

suffered damage to his reputation which resulted in loss of esteem, standing, and responsibility

both in the community and in his workplace.

131.     The damage FERRE caused to HOLMES'S reputation directly caused or substantially

contributed to HOLMES not being rehired by his employer Vero Beach Roofing.

132.     The damage FERRE caused to HOLMES' reputation substantially contributed to

HOLMES losing numerous family court hearings before finally being awarded full temporary

custody of LH in May of 2022. The Plaintiff estimates he has paid over $30,000 in family lawyer

fees.

        WHEREFORE, Plaintiff demands judgement against FERRE for compensatory and

        punitive damages and costs and any other relief this Court deems appropriate.

## COUNT VI: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS

## (WHITE -DEFAMATION)

133.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1

through 83.

134.     The actions of WHITE occurred within his scope of employment with IRCSO, under

color of law, having occurred within the authorized time and space limits of his duties and for a

purpose to serve LOAR.

135.     At all times material hereto, WHITE had a legal duty not to subject HOLMES to false

statements of fact.

136.     WHITE defamed HOLMES by making several false statements of fact on his arrest

report and case narrative as to HOLMES being a violent and dangerous individual who has a

history of violence and violence towards law enforcement.

137.     WHITE knew the statements were false and defamatory but did so with the intent to try

and justify his actions and the actions of other deputies who had illegally forced entry into

HOLMES' home and caused catastrophic damage and tortured HOLMES for several hours before arresting him for a minor crime that he did not commit.

138.     Given the malicious intent and background surrounding WHITE'S actions, his false statements of fact were not privileged.

139.     WHITE violated HOLMES'S rights under the Constitution of the United States and violated HOLMES'S right to be free from false statements of fact by a sheriff deputy acting under the color of law.

140.     WHITE knew or should have known and every reasonable deputy sheriff in his position would have concluded that HOLMES has a constitutional right not to be defamed by a deputy sheriff making false statements of fact, which the deputy sheriff knew were false and defamatory.

141.     These violations were of a type or character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in federal case law, including that of Federal Court of Appeals of the United States, 11th Circuit, and under the case law of the U.S. Supreme Court.

142.     The aforesaid acts of WHITE were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of HOLMES, and for this reason HOLMES is entitled to an award of punitive damages.

143.     As a direct and proximate result of the unlawful conduct of WHITE, HOLMES was deprived of his civil rights and forced to suffer great aggravation, humiliation, embarrassment, mental anguish, serious physical injuries, loss of standing in the community, loss of timesharing with LH, and pecuniary losses including loss of income and loss of earning capacity.

144.     As a direct result and proximate result of WHITE'S civil rights violations, HOLMES suffered damage to his reputation which resulted in loss of esteem, standing, and responsibility both in the community and in his workplace.

145.     The damage WHITE caused to HOLMES' reputation substantially contributed to
HOLMES losing numerous family court hearings before finally being awarded full temporary
custody of LH in May of 2022. The Plaintiff estimates he has paid over $30,000 in family lawyer
fees.

146.     **HOLMES HAS NEVER ONCE BEEN VIOLENT TOWARDS LAW
ENFORCEMENT. HOLMES HAS NEVER ONCE IN THEIR 12 YEAR RELATIONSHIP
OR AT ANY TIME THEREAFTER BEEN VIOLENT OR THREATENED VIOLENCE
TOWARDS MS. SCHULZE. HOLMES HAS NEVER ONCE SINCE THE DAY HE WAS
BORN BEEN VIOLENT TOWARDS LH NOR HAS LH EVER WITNESSED HOLMES
USE VIOLENCE TOWARDS ANYONE.**

WHEREFORE, Plaintiff demands judgement against WHITE for compensatory and
punitive damages and costs and any other relief this Court deems appropriate.

## COUNT VII: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS

## (MATHISEN-EXCESSIVE FORCE)

147.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1
through 83.

148.     The actions of MATHISEN occurred within his scope of employment with IRCSO, under
color of law, having occurred within the authorized time and space limits of his duties and for a
purpose to serve LOAR.

149.     At all times material hereto, MATHISEN had a legal duty not to subject HOLMES to
excessive and unnecessary force.

150.     On September 13,2019, MATHISEN used excessive and unnecessary force while
attempting to arrest HOLMES for a non-violent, misdemeanor crime that he did not commit and
in doing so deprived HOLMES of life, liberty, and the due process of law.

151.     MATHISEN failed to identify himself as law enforcement before he and other members of IRCSO forced entry in HOLMES home, failed to issue verbal commands to HOLMES who was hiding in his attic. HOLMES was hiding in his attic and posed no threat to MATHISEN and law enforcement. At all times after locating HOLMES in the attic, MATHISEN knew where HOLMES was located. Instead of simply arresting HOLMES, MATHISEN spent several hours torturing HOLMES in his own home. By MATHISEN'S own admission in his arrest report he threw/shot at least 6 OC gas canisters at HOLMES. MATHISEN knew HOLMES was in a attic with little to no ventilation. MATHISEN also knew the square footage of the attic HOLMES was hiding in was very small. Despite these facts MATHISEN continued to throw/shoot canister after canister at HOLMES who offered no resistance other than hiding for fear of his life.

152.     After several hours of being gassed by MATHISEN, HOLMES fell/jumped out of the attic and was taken into custody.

153.     In order for MATHISEN to throw and shoot gas canisters at HOLMES, MATHISEN smashed holes in the ceiling all throughout the house owned by HOLMES causing catastrophic damage. The exact cost of the damage is unknown because HOLMES has been unable to pay for the repairs despite this incident happening almost four years ago.

154.     MATHISEN'S use of force was clearly unreasonable and excessive. The amount of gas that MATHISEN used far exceeded the manufacturers recommended amount that should be used at any one time on a human being in such a small area. At no time did HOLMES consent to such bodily harm/offensive conduct.

155.     MATHISEN likely used excessive force on HOLMES because of past encounters he had had with HOLMES which had embarrassed MATHISEN and hurt his ego.

156.     As a direct and proximate result of MATHISEN'S acts, omissions, and clear use of excessive force, MATHISEN deprived HOLMES of the rights guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution.

157.     HOLMES claims damages for physical injuries, mental suffering, damage to HOLMES

reputation, damage to HOLMES home, deprivation of his civil rights, and any and all further

relief this Court deems appropriate.

WHEREFORE, Plaintiff demands judgement against MATHISEN for compensatory and

punitive damages and costs and any other relief this Court deems appropriate.

## COUNT VIII: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS

## (FARINACCI-FAILURE TO PROVIDE MEDICAL TREATMENT)

158.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1

through 83.

159.     The actions of FARINACCI occurred within his scope of employment with IRSO, under

color of law, having occurred within the authorized time and space limits of his duties and for a

purpose to serve LOAR.

160.     At all times material hereto, FARINACCI had a legal duty to provide medical assistance

to HOLMES once he was in his custody.

161.     The Due Process Clause of the Fourteenth Amendment requires government officials to

provide medical care to individuals who have been injured during apprehension by law

enforcement.

162.     FARINACCI knew that after HOLMES had been in a attic with temperatures well above

100 degrees for several hours and having had over ten canisters of OC and tear gas thrown in very

close proximity of his person, HOLMES was in desperate need of water.

163.     HOLMES was tortured by FARINACCI who refused to provide or let others provide

basic medical treatment.

164.     HOLMES was extremely dehydrated and was in extreme suffering and FARINCACCI

knew it as any reasonable person would of.

165.    HOLMES had a serious BUT simple medical need, water.  HOLMES' desperate need for water was readily available to FARRINACCI to provide to HOLMES, yet he refused. Not only did he refuse to provide HOLMES with water, but he refused to allow the ambulance paramedic who was transporting HOLMES to the hospital to give him water and he also refused to allow staff at the hospital to provide HOLMES with water.

166.    FARRINACCI disregarded the risk of serious harm and his conduct amounted to more than gross negligence, FARRINACCI tortured HOLMES.

167.    FARRINACCI intentionally delayed the treatment of HOLMES' serious and relevant medical need and in doing so violated HOLMES' Eighth Amendment and did cause wanton infliction of pain.

168.    Several hours after being placed in FARRINACCI'S custody, HOLMES was finally given water by the detectives who came to the hospital to serve him with a protection order.

169.    As a direct and proximate result of FARRINACCI'S acts, omissions, and denial of medical treatment, FARRINACCI deprived HOLMES of the rights guaranteed to him by the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution.

170.    HOLMES claims damages for physical injuries, mental suffering, damage to HOLMES' reputation, damage to HOLMES' home, deprivation of his civil rights, and all further relief this Court deems appropriate.

WHEREFORE, Plaintiff demands judgement against FARRINACCI for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

## COUNT VIIII: 42 U.S.C. § 1983 DEPRIVATION OF PLANTIFF'S CIVIL RIGHTS AGAINST INDIAN RIVER COUNTY SHERIFF OFFICE [LOAR]

171.    Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

172.     At all times, LOAR was responsible for IRSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

173.     At all times material hereto, LOAR was charged with the responsibility of adopting and implementing rules and procedures for the proper and efficient maintenance, supervision and control of the officers of the IRSO. These duties include but are not limited to:

a.   To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity of using excessive force through sadistic violence on a citizen who was peacefully residing in the safety of his own home.

b.   To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity witnessing other officers/supervisors violate a citizen's civil rights and not reporting it.

c.    To create, adopt and implement rules, regulations, practices and procedures, toward hiring and retaining law enforcement officers who do not have a propensity for torturing citizens.

d.   To implement rules, regulations, policies, practices and procedures for the proper and efficient supervision, discipline and control of law enforcement officers to reduce or eliminate instances of lying and to properly punish those officers who commit same.

e.   To implement rules, regulations, policies, practices and procedures necessary to properly and fully investigate claims by citizens that law enforcement officers used unnecessary and excessive force in the course of their duties.

f.   To implement rules, regulations, policies, practices and procedures necessary to identify and terminate employees and supervisors that repeatedly use excessive force and unprovoked violence towards citizens.

174.     LOAR had a legal duty to HOLMES to exercise reasonable care and judgment in hiring, training and retaining safe and competent employees and supervisors. LOAR knew or should of known that MATHISEN, WHITE, MCKAY, FARINACCI, and FERRE were dangerous and failed to take any action to terminate their employment or relieve him of their duties. LOAR failed in his duty and that failure caused HOLMES damage.

175.     LOAR failed to adequately train and supervise and direct IRCSO and its deputy sheriffs and their supervisors concerning the rights of the citizens they encounter in their duties, such that it is a policy, custom and practice for deputy sheriffs, including FARINACCI, WHITE , MCKAY, MATHISEN, and FERRE to take reckless and extreme actions against the citizens they encounter, including HOLMES.

176.     LOAR was on notice, by a history of widespread abuse and violence, the need to correct the dangerous and extreme actions of IRCSO and of its supervisors and its deputy sheriffs concerning the rights of the citizens they encountered in the course of their duties. It was LOAR's policy, practice and custom for sheriff deputies to take extreme and violent actions against the citizens they encountered, including HOLMES.

177.     The need for better training and competent supervisors was so obvious but LOAR instead made a conscious NOT to provide body cameras to his deputies. And in doing so LOAR allowed his deputies to spread corruption throughout the entire sheriff's department including into the minds, hearts and minds of many deputy sheriffs. LOAR's conscious choice not to act has resulted in the violation of HOLMES' civil rights.

178.     With disregard of the rights of the citizens that IRCSO and its deputies encounter, LOAR has deliberately either failed to direct, failed to fully require, or has tried to limit, IRCSO and others in the proper investigation of the extreme and unlawful acts of his deputy sheriffs. It was LOAR'S policy and practice of limiting investigations of sheriff deputies with very little or no

serious questions raised regarding the deputy sheriffs' actions or to the claims made by citizens against a deputy sheriff.

179.     Because investigations were limited and were not properly investigated, findings of no excessive force and accepting the deputy sheriffs' word as truth and somehow finding justification for his sheriff deputies extreme and violent behavior, LOAR has consented to the deputy sheriff's unlawful conduct.

180.     If LOAR had not consciously engaged in the foregoing by keeping a blind eye to the actions of his sheriff deputies and their supervisors, and would of properly investigated and punished (including termination and charging deputies with crimes that they committed) sheriff deputies who violated the law and IRCSO policy, then the actions of WHITE, MCKAY,  FERRE, FARINACCI and MATHISEN would of never taken place and the damages HOLMES suffered would not of occurred and there would have been no need to bring this lawsuit.

181.     The actions in this case committed by WHITE, MCKAY, , FARINACCI, FERRE AND MATHISEON were caused by the policies, practices and customs of LOAR in the failing of his duties as previously alleged in this Complaint.

182.     If sheriff deputies would have known that they were not free to lie on police reports and write false narratives, then it is likely Deputies would of never of arrested HOLMES and if they had, only used the appropriate level of force necessary to arrest HOLMES.

183.     In addition to the policies, customs and practices referenced above, LOAR was grossly negligent, reckless and deliberately disregarded the health, safety and welfare of HOLMES and the citizens of Indian River County in that LOAR expressly acknowledged and approved to the failure to properly train, supervise, control and review for continued employment, the conduct of WHITE, MCKAY, MATHISON, FARINACCI, AND FERRE. And as a result, LOAR had reason to know that WHITE, MCKAY,  MATHISON, FARINACCI, AND FERRE would act unlawfully, and he failed to stop their actions.

184. The gross negligence, deliberate, and reckless behavior of LOAR identified above was a further underlying cause of the constitutional violations committed by WHITE, MCKAY, MATHISON, FARINACCI, AND FERRE and was the immediate cause of HOLMES' injuries and damages mentioned above.

185. The Plaintiff reserves the right to amend the Complaint to correct legal errors or omissions due to his inexperience in legal matters, or to supplement additional information, which is revealed through discovery, or for any other reason. Plaintiff asks this Court to recognize the fact that Pro Se litigants' pleadings are to be construed liberally and held to less stringent standards than lawyers.

WHEREFORE, Plaintiff demands judgment against LOAR, for actual damages, pain, suffering and emotional distress, special damages including past and future lost earnings, special damages including the damage done to HOLMES' home, crippling anxiety necessitated solely by WHITE, MCKAY, MATHISON, FARINACCI, AND FERRE illegal and improper acts, and demands a jury trial of all issues triable.

## COUNT X: NEGLIGENCE STATE LAW CLAIM AGAINST MATHISEN

186. Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

187. MATHISEN owes a duty of care in the force used when apprehending a potential suspect.

188. MATHISEN breached this duty by ambushing the Plaintiff in his home and unnecessarily causing catastrophic damage to his home while trying to arrest him for a minor crime.

189. MATHISEN also breached this duty by needlessly throwing and shooting an excessive amount of tear and OC gas at the Plaintiff who was in a attic with very low square footage and with no ventilation.

190. These acts caused severe physical and emotional harm to the Plaintiff.

191.    Defendants, IRCSO and LOAR, failed to properly train MATHISEN, to ensure that he was fully aware of the proper use of force.

192.    Defendants, IRCSO and LOAR, are vicariously liable for the actions of its employee, Deputy MATHISEN, as he was employed by them and working at the time of the incident within the scope of his employment.

193.    As a direct and proximate result of MATHISEN'S negligence, the Plaintiff, RYAN HOLMES, has suffered serious and permanent personal injuries and will in the future, suffer damages, including but not limited to the following: bodily injuries, pain and suffering, severe mental anguish, loss of the enjoyment of life, and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against MATHISEN for compensatory and punitive damages and costs and any other relief this Court deems appropriate.

## COUNT XI: NEGLIGENT HIRING, RETENTION AND SUPERVISON BY INDIAN RIVER COUNTY SHERIFF'S OFFICE [LOAR] STATE LAW CLAIM

194.    Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

195.    At all times material, the deputies and detectives were under the direction, supervision, and control of the Defendant, INDIAN RIVER COUNTY SHERIFF OFFICE [LOAR], either directly or through its agents.

196.    At all times material, the Defendant, INDIAN RIVER COUNTY SHERIFF OFFICE [LOAR], either directly or through its agents, negligently hired, retained and/or supervised its deputies and detectives when the Defendant knew or should have known that a failure to properly evaluate its deputies on their understanding, knowledge and training on how to properly investigate an alleged crime and on how to properly apprehend a subject and the level of force to use and when to use it could result in injury.

197.     Despite this knowledge, the IRCSO [LOAR] failed to exercise reasonable care in hiring, retaining, and/or supervising its deputies.

198.     As a direct and proximate cause of the acts described above, the Plaintiff suffered serious and permanent personal injuries and will in the future, suffer damages including, but not limited to the following: bodily injuries, pain and suffering, severe mental anguish, lost capacity of the enjoyment of life, and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against IRCSO [LOAR] for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XII: BATTERY STATE LAW CLAIM AGAINST MATHISEN AND LOAR

199.     MATHISEN committed an illegal, unjustified touching (throwing/shooting numerous gas canisters at HOLMES) of HOLMES without his permission, causing him damages.

200.     As MATHISEN'S employer, LOAR was responsible for his acts and is liable to HOLMES for his damages, including pain and suffering, loss of capacity of life, mental suffering, physical suffering, shame, loss of timesharing with LH, and has been inconvenienced and suffered loss to his reputation and resulting pecuniary losses including loss of income and loss of income and loss of earning capacity.

201.     WHEREFORE, Plaintiff demands judgement against MATHISEN and LOAR for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS STATE LAW CLAIM AGAINST FERRE

202.     FERRE intentionally or with extreme recklessness, falsely accused, filed a fabricated and false probable cause affidavit in which HOLMES was falsely arrested. FERRE fabricated

falsehoods in support of his actions, providing false sworn statements, affecting HOLMES' right

to have custody of LH and the ability to earn an income.

203.     FERRE'S conduct was outrageous, as to go beyond all bounds of decency, and is

regarded as odious and utterly intolerable in a civilized community.

204.     The actions of FERRE caused HOLMES emotional distress, which is severe and

continues to this day. This has resulted in HOLMES enduring pain and suffering, loss of capacity

of life, mental suffering, shame, public ridicule, and has been inconvenienced and suffered

pecuniary losses, including loss of income and loss of earning capacity.

    WHEREFORE, Plaintiff demands judgement against FERRE for actual compensatory

damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XIIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS STATE LAW CLAIM AGAINST WHITE

205.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1

through 83 .

206.     WHITE intentionally or with extreme recklessness, falsely accused, filed a fabricated and

false case narrative to try and justify the illegal acts of himself and fellow deputies. WHITE

fabricated falsehoods in support of his actions, intentionally lied about HOLMES being violent

towards law enforcement and others and intentionally tried to deceive others into believing

HOLMES was a violent person. WHITE'S actions affecting HOLMES' right to have custody of

LH and the ability to earn an income.

207.     WHITE'S conduct was outrageous, as to go beyond all bounds of decency, and is

regarded as odious and utterly intolerable in a civilized community.

208.     The actions of WHITE caused HOLMES emotional distress, which is severe and

continues to this day. This has resulted in HOLMES enduring pain and suffering, loss of capacity

of life, mental suffering, shame, public ridicule, and has been inconvenienced and suffered

pecuniary losses, including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against WHITE for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XV: ASSAULT AND BATTERY AGAINST INDIAN RIVER COUNTY SHERIFF OFFICE [LOAR] STATE CLAIM

209.    Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83 .

210.    While acting within the course and scope of their employment with INDIAN RIVER COUNTY SHERIFF OFFICE [LOAR], Defendants, WHITE, MATHISEN, FARINACCI, MCKAY, and FERRE attacked Plaintiff, with the intention of brining about a harmful or offensive contact on the Plaintiff.

211.    WHITE, MATHISEN, FARINACCI, MCKAY, and FERRE unlawfully touched Plaintiff without the Plaintiff's consent and caused severe bodily injury to the Plaintiff, as a result of said harmful, offensive and unlawful touching.

212.    As a direct and proximate result of said unlawful touching, Plaintiff suffered serious and permanent personal injuries and will in the future, suffer damages including, but not limited to bodily injuries, pain and suffering, severe mental anguish, lost capacity of the enjoyment of life, and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against IRCSO [LOAR] for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XVI: INTENTIONAL INFLICTION OF PHYSICAL PAIN AND SUFFERING STATE LAW CLAIM AGAINST FARINACCI

213.    Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

214.    FARINACCI tortured HOLMES while he was in his custody by refusing to give him water and refusing to allow paramedics and staff at the hospital to give him water.

215.     HOLMES had just been put through hell, surviving several hours in his attic with temperatures far exceeding 100 degrees while having gas grenades shot and thrown at him by deputies. FARINACCI had a duty to provide HOLMES with water but instead of attending to his medical needs FARINACCI decided to continue to torture HOLMES.

216.     The actions of FARINACCI caused HOLMES physical pain and suffering. This has resulted in HOLMES enduring pain and suffering, loss of capacity of life, mental suffering, shame, public ridicule, and has been inconvenienced and suffered pecuniary losses, including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against FARINACCI for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XVII: MALICIOUS PROSECUTION AGAINST FERRE STATE CLAIM

217.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

218.     FERRE wrongfully caused criminal proceedings to be instituted against Plaintiff with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omissions, which reports were relied upon by prosecuting authorities.

219.     FERRE intentionally and knowingly failed to submit evidence that he knew would contradict and disprove his own statements.

220.     Based on the elaborate story FERRE fabricated, the State Attorneys Office brought two criminal charges against Plaintiff, trespassing which was changed after arrest to stalking and resisting arrest without violence. These charges were ultimately "nolo prosequi" by the State Attorney's Office.

221.     As a direct and proximate result of the conduct of FERRE, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and loss of

timesharing with LH. These losses are continuing, and Plaintiff will suffer losses in the future, in violation of his civil rights.

WHEREFORE, Plaintiff demands judgement against FERRE for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## COUNT XVIII: 42 U.S.C. § 1983 VIOLATION OF CIVIL RIGHTS CLAIM BY USE OF EXCESSIVE FORCE (FIRST AMENDMENT RETALIATION) AGAINST MATHISEN

222.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1 through 83.

223.     This cause of action is brought by Plaintiff against MATHISEN for deprivation of constitutional rights within the meaning of 42 U.S.C. § 1983.

224.     MATHISEN proximately caused HOLMES to suffer injuries from the use of severe, violent, unnecessary and excessive force upon him without cause nor justification.

225.     While MATHISEN was acting under the authority of the State of Florida and under color of law as a deputy in the employ of IRCSO, he subjected the Plaintiff to the deprivation of the rights and privileges secured to him by the Constitution of the United States to be secure in his person against the use of excessive force under the Fourth Amendment within the meaning of 42 U.S.C. § 1983.

226.     With regard to the violations of the constitutional rights of HOLMES as alleged in this count, the actions of MATHISEN were done with malicious intent, ill will, spite, intent to injure, evil motive, wickedness, formed design to injure or oppress HOLMES and were done with a reckless or callous indifference to HOLMES' federally protected rights entitling HOLMES to an award of punitive damages against MATHISEN in his individual capacity.

227.     MATHISEN'S use of excessive force on HOLMES was in retaliation for HOLMES' protected speech and rights under the First Amendment.

228.     The use of the severe, violent, unnecessary and excessive force upon HOLMES occurred without cause or justification.

229.     The conduct of MATHISEN towards HOLMES constitutes unlawful retaliation in

violation of HOLMES' clearly established rights under the First and Fourteenth Amendments,

and 42 U.S.C. § 1983.

230.     As a direct and proximate result of the acts described above, Plaintiff suffered great

humiliation, mental and physical suffering and loss of reputation.

231.     As a further direct and proximate result of the conduct of MATHISEN, Plaintiff suffered

loss of his liberty and freedom, severe mental anguish, and loss of capacity for the enjoyment of

life. Plaintiff's losses are either permanent or continuing and Plaintiff will suffer the losses in the

future, in violation of Plaintiff's civil rights.

WHEREFORE, Plaintiff demands judgement against MATHISEN for actual

compensatory damages, pain, suffering, emotional distress and demands a jury trial of all

issues triable.

## COUNT XIIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS STATE
## LAW CLAIM AGAINST MATHISEN

232.     Plaintiff hereby incorporates by reference the allegations contained in paragraph 1

through 83 .

233.     MATHISEN intentionally or with extreme recklessness, tortured HOLMES in his own

home for over three hours.

234.     MATHISEN'S conduct was outrageous, as to go beyond all bounds of decency, and is

regarded as odious and utterly intolerable in a civilized community.

235.     The actions of MATHISEN caused HOLMES emotional distress, which is severe and

continues to this day. This has resulted in HOLMES enduring pain and suffering, loss of capacity

of life, mental suffering, shame, public ridicule, and has been inconvenienced and suffered

pecuniary losses, including loss of income and loss of earning capacity.

WHEREFORE, Plaintiff demands judgement against MATHISEN for actual compensatory damages, pain, suffering, emotional distress and demands a jury trial of all issues triable.

## JURY DEMAND

A demand for a jury trial is hereby made.

Dated October 1, 2023

Ryan Holmes

Louieholmes08@gmail.com

772-559-9965

 

PRESS



**U.S. POSTAGE PAID**
PME 2-Day
MILBRIDGE, ME 04658
OCT 10, 2023

34950

**$28.75**

RDC 07

R2303S100952-01



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; May 2020; All rights reserved.

## UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL EXPRESS®**

EI 252 751 297 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)     PHONE (772) 559-9985

RYAN HOLMES
1050 10th PL
VERO BEACH, FL
32960

**PAYMENT BY ACCOUNT (if applicable)**

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|

**DELIVERY OPTIONS (Customer Use Only)**

☑ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|
| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage $ | |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time ☐ 6:00 PM | Insurance Fee $ | COD Fee $ |
| Time Accepted ☐ AM ☐ PM | | Return Receipt Fee $ | Live Animal Transportation Fee $ |
| Special Handling/Fragile $ | Sunday/Holiday Premium Fee $ | Total Postage & Fees | |
| Weight ___ lbs. ___ ozs. | Flat Rate | Acceptance Employee Initials | $ |

TO: (PLEASE PRINT)     PHONE (772) 467-2300

US DISTRICT COURTHOUSE
101 S. US HWY 1 ROOM 1016
FT. PIERCE, FL.

ZIP + 4® (U.S. ADDRESSES ONLY)

3 4 9 5 0 _____

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |
|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

LABEL 11-B, MAY 2021     PSN 7690-02-000-9996

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

**⇐ PEEL FROM THIS CORNER**

  

IF May 2020
12 1/2 x 9 1/2